07-2352 TLS

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Paul Michael Maric, being duly sworn, depose and state as follows:

## I. INTRODUCTION

1.   I am a Special Agent of the Federal Bureau of Investigation ("FBI") and am assigned to the Washington Field Office in the District of Columbia. I am assigned to a Counterintelligence Squad which investigates crimes involving national security. I have been an FBI Special Agent for approximately five years, have completed FBI training in the proper handling of classified information, and have been involved in the execution of search warrants and seizing evidence from residences and other locations.   Prior to joining the FBI, I worked as a prosecuting attorney in Akron, Ohio, for four years, and as a judicial attorney for the Ohio Court of Appeals, Ninth Judicial District, for two years.

2.   I am currently assigned to a task force that is conducting an investigation into the unauthorized disclosure, or "leak," of classified information to two New York Times ("NYT") reporters, James Risen and Eric Lichtblau, who work in the NYT's Washington, D.C. Bureau, concerning alleged activities of the National Security Agency ("NSA"), including the Terrorist Surveillance Program ("TSP").   The investigation concerns potential violations of Title 18, United States Code (U.S.C.), Sections 793 (Unlawful Disclosure of Classified National Defense Information), 798 (Unlawful Disclosure of Classified Information) and 371 (Conspiracy To Commit an Offense Against The United States).   As detailed below, the investigation to date has established probable cause to believe that William Edward Binney ("Binney"), Diane Sue Roark ("Roark"), Edward Francis Loomis ("Loomis"), and John Kirk Wiebe ("Wiebe"), have without authorization removed and retained classified documents or materials at an

unauthorized location, that is, their respective homes, and disclosed such information to other persons not authorized to receive it, including at least one member of the media.

3. This affidavit is made in support of an application for warrants authorizing searches of the residences of (a) Binney, located at 7800 Elberta Drive, Severn, Maryland (described more fully in Attachment A), (b) Roark, located at 2000 North Scenic View Drive, Stayton, Oregon (described more fully in Attachment B), (c) Loomis, located at 515 Overdale Road, Baltimore, Maryland (described more fully in Attachment C), and (d) Wiebe, located at 1390 Alison Court, Westminster, Maryland (described more fully in Attachment D), and the seizure of classified information and/or evidence establishing those individuals' unauthorized removal, retention and/or disclosure of classified documents or materials, in violation of one or more of the aforementioned statutes. A listing of items to be seized at each location is described in Attachment E.

4. The facts set forth in this affidavit are those personally known to me, or communicated to me by other FBI Special Agents and personnel with knowledge of this investigation. Since this affidavit is being submitted for the limited purpose of securing search warrants, I have set forth only those facts which I believe are necessary to establish probable cause to believe that fruits, instrumentalities and/or evidence of the above-specified offences will be located at the aforementioned premises.

## II. BACKGROUND

### A. The Attacks of September 11 and the Terrorist Surveillance Program

5. On September 11, 2001, the al Qaeda terrorist network launched a set of coordinated attacks along the East Coast of the United States. Four commercial jetliners, each carefully selected to be fully loaded with fuel for a transcontinental flight, were

hijacked by al Qaeda operatives. Two of the jetliners were targeted at the Nation's financial center in New York and were deliberately flown into the Twin Towers of the World Trade Center. The third was targeted at the headquarters of the Nation's Armed Forces, the Pentagon. The fourth was apparently headed toward Washington, D.C., when passengers struggled with the hijackers and the plane crashed in Shanksville, Pennsylvania. The intended target of this fourth jetliner was evidently the White House or the Capitol, strongly suggesting that its intended mission was to strike a decapitation blow on the Government of the United States – to kill the President, the Vice President or Members of Congress. The attacks of September 11 resulted in approximately 3,000 deaths, the highest single-day death toll from hostile foreign attacks in the Nation's history. The attacks shut down air travel in the United States, disrupted the Nation's financial markets and government operations, and caused billions of dollars in damage to the economy.

6.    On September 14, 2001, the President declared a national emergency "by reason of the terrorist attacks at the World Trade Center, New York, New York, and the Pentagon, and the continuing and immediate threat of further attacks on the United States." Proclamation No. 7463, 66 Fed. Reg. 48,199 (Sept. 14, 2001). The same day, Congress passed a joint resolution authorizing the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" of September 11, which the President signed on September 18. Authorization for Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (Sept. 18, 2001) (reported as a note to 50 U.S.C.A. § 1541). Congress also expressly acknowledged that the attacks rendered it "necessary and

3

appropriate" for the United States to exercise its right "to protect United States citizens both at home and abroad," and in particular recognized that "the President has authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States." *Id.* pmbl. Congress emphasized that the attacks "continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States." *Id.* The United States also launched a large-scale military response, both at home and abroad.   In the United States, combat air patrols were immediately established over major metropolitan areas and were maintained 24 hours a day until April 2002.  The United States also immediately began plans for a military response directed at al Qaeda's base of operations in Afghanistan.  Acting under his constitutional authority as Commander in Chief, and with the support of Congress, the President dispatched forces to Afghanistan and, with the assistance of the Northern Alliance, toppled the Taliban regime.

      7.    Against this unfolding background of events in the fall of 2001, there was substantial concern that al Qaeda and its allies were preparing to carry out another attack within the United States.  Al Qaeda had demonstrated its ability to introduce agents into the United States undetected and to perpetrate devastating attacks, and it was suspected that additional agents were likely already in position within the Nation's borders.  To counter this threat, the President authorized the NSA to intercept international communications into and out of the United States of persons linked to al Qaeda or related terrorist organizations. Press Conference of President Bush (Dec. 19, 2005), *available at* http://www.whitehouse.gov/news/releases/2005/12/20051219-2.html.   This activity — which subsequently was identified as the Terrorist Surveillance Program (TSP) – was

"critical" to national security and was designed to establish an early warning system to detect and prevent another catastrophic terrorist attack on the United States. Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden (Dec. 19, 2005), *available at* http://www.whitehouse.gov/news/releases/2005/12/20051219-1.html.

## B.   The Unauthorized Disclosure Of Classified Information Concerning The TSP

8.   In early October 2004, James Risen contacted Public Affairs officials in the Office of the Vice President, the National Security Council, the Central Intelligence Agency ("CIA") and the NSA about a news article he was writing. The Public Affairs officials and other high-ranking Executive Branch officials have confirmed that during the ensuing days, Risen engaged in a series of email communications, conversations and meetings with the officials regarding the story. In substance, Risen represented that he had obtained information about a warrantless electronic surveillance program that he said was known to only a few officials within the United States Government. Ultimately, Risen's inquiries led to a meeting on October 25, 2004, at The White House, involving other representatives of The New York Times and high-ranking Executive Branch officials. This was followed by another meeting about ten days later at the Department of Justice involving Risen, Lichtblau, a third NYT representative, and several high-ranking Executive Branch officials. Subsequent to this meeting, NYT representatives elected not to publish Risen's story without first conferring further with the high-ranking Executive Branch officials. As a result, no story regarding the TSP was published in 2004.

9.   Approximately one year later, in the fall of 2005, NYT representatives again contacted high-ranking Executive Branch officials and advised that they were considering publishing the story. In that regard, it was represented that additional "sources" had

5

come forward and raised concerns about the surveillance activities.   A number of meetings ensued between representatives of The New York Times, high-ranking Executive Branch officials and Members of Congress.     Despite these ongoing discussions, NYT published its story on its website the evening of December 15, 2005. The story, titled *Bush Lets U.S. Spy on Callers Without Courts*, was authored by Risen and Lichtblau and appeared in the next day's edition of the newspaper.   This article was followed by a series of NYT articles, written or co-authored by Risen and/or Lichtblau describing a range of alleged NSA activities and related circumstances, including:

a. *Spy Agency Mined Vast Data Trove, Officials Report*, Dec. 24, 2005, by James Risen and Eric Lichtblau;

b. *Defense Lawyers in Terror Cases Plan Challenges Over Spy Efforts*, Dec. 28, 2005, by James Risen and Eric Lichtblau;

c. *Justice Deputy Resisted Parts of Spy Program*, Jan. 1, 2006, by James Risen and Eric Lichtblau; and

d. *Spy Agency Data After Sept. 11 Led FBI to Dead Ends*, Jan. 17, 2006, by Lowell Bergman, Eric Lichtblau, Scott Shane and Don Van Natta, Jr.

10.  In early January 2006, Risen published a book, titled <u>State of War: The Secret History of the CIA and the Bush Administration</u>.  Chapter 2 of the book was entitled, "The Program," and dealt entirely with alleged NSA activities, including the warrantless surveillance program described in the Risen and Lichtblau articles.

11.  Since publication of the aforementioned articles and book, there have been numerous additional stories in various media, including but not limited to newspapers, magazines, television, radio and the internet, regarding the TSP and related matters.  As

6

set forth below, one such article, which appeared in                                    2006,

titled                                                                           by

suggests that one or more of the four subjects discussed herein disclosed highly classified

information concerning the NSA and its activities, sources and methods, to unauthorized

persons.

## III.    INVESTIGATION OF THE LEAK OF CLASSIFIED INFORMATION CONCERNING THE TSP

12.    Shortly after the first TSP article, in late December 2005, the DOJ and the

FBI initiated an investigation concerning the unauthorized disclosure of classified

information contained in that article. That investigation has been continuing since that

time and has involved interviews of in excess of 1,000 individuals, issuance of more than

200 grand jury subpoenas, principally for telephone and email records, and review of

thousands of pages of documents, including telephone and email records for

approximately 60 individuals.

### A.    Background Regarding Four Subjects Of The Investigation

13.    Through that process, the following individuals, among others, have been

identified as subjects of the investigation: (a) William Binney, a former senior operations

officer for the NSA, who now resides in Severn, Maryland; (b) Diane Roark, a former

staff member on the U.S. House of Representatives Permanent Select Committee on

Intelligence (HPSCI), who now resides in Stayton, Oregon; (c) Edward Loomis, a former

cryptologic computer scientist at NSA, who now resides in Baltimore, Maryland; and (d)

John Wiebe, a former acting division chief at NSA, who now resides in Westminster,

Maryland.

7

14. Binney is a former senior operations officer for the NSA who retired on October 31, 2001, after 36 years of service. Since 2004, Binney has worked as a contractor for the NSA and has entered NSA facilities approximately two times a year. After retiring, Binney started a three-person contracting firm on December 3, 2001, with Loomis and Wiebe. The company is called Entity Mapping LLC (Entity). According to Binney, the company has done work for NSA, Boeing, and the Department of Homeland Security. In addition to being a partner in Entity, Binney worked for Eagle Alliance from October 2001 to October 2002; Zytel Corporation (General Dynamics sub-contractor) from November 22, 2002, to May 5, 2004; Diversified Development Corporation from July 2002 to the present; and Entegra Systems, Inc. from October 2005 to the present. While working at the NSA, Binney was the program manager of a program called

Additionally, he had regular contact with Roark while she was serving as a HPSCI staff member. At no time during or subsequent to his employment at the NSA has Binney been authorized to possess NSA classified documents or data at his home or on his personal computer.

15. Roark is a former Congressional staff member who worked for seventeen years on the HPSCI until she retired in April 2002. At the HPSCI, Roark assisted in oversight of various compartmentalized intelligence programs at the NSA, as well as related Congressional budget approval issues. After Roark left the HPSCI, she stayed in the Washington, D.C., area until early 2003, when she moved to Oregon. At no time during or subsequent to her service on the HPSCI has Roark been authorized to possess NSA classified documents or data at her home or on her personal computer.

8

16. Loomis is a former cryptologic computer scientist for the NSA who retired in November 2001 after twelve years of service. Since the end of 2002, Loomis has worked as a contractor for the NSA and has entered NSA facilities on a regular basis. After retiring, Loomis started Entity, the above mentioned three-person contracting firm, with Binney and Wiebe. The company's corporate headquarters is located at 515 Overdale Road, Baltimore, Maryland, which is also Loomis' home address. In addition to being a partner in Entity, Loomis worked for Eagle Alliance from November 2001 to October 2002; GTE Tactical Systems (General Dynamics sub-contractor) from November 2002 to present; and Diversified Development Corporation from October 2002 to the present. At no time during or subsequent to his employment at the NSA has Loomis been authorized to possess NSA classified documents or data at his home or on his personal computer.

17. Wiebe is a former acting division chief for the NSA who retired in October 2001 after approximately 26 years of service. After Wiebe retired from the NSA, he continued to work as a contractor for the NSA and regularly has entered NSA facilities. On December 3, 2001, Wiebe started Entity with Binney and Loomis. In addition to being a partner in Entity, Wiebe worked for Eagle Alliance from October 2001 to November 2002; Diversified Development Corporation from September 2002 to the present; and GTE Tactical Systems (General Dynamics sub-contractor) from April 2003 to present. At no time during or subsequent to his employment at the NSA has Wiebe been authorized to possess NSA classified documents or data at his home or on his personal computer.

**B.    The Subjects' Unlawful Disclosure Of Classified NSA Information**

**1.    Roark And Binney To Disclose The        To Unauthorized Persons**

9

18. According to NSA officials who have been interviewed in connection with this investigation, in the mid to late 1990s, Binney, Loomis and Wiebe worked on several programs that                          at the NSA. One of these          programs, which Binney claimed during an FBI interview that he developed,[1] was called

According to Binney,                     was a pre-cursor to the Moreover, Binney believed that                was less costly than the          and included                     purportedly designed to address

associated with NSA activities.

19. Both before and after 9/11, Binney, as the                    project manager, provided Roark, as the HPSCI staff member with NSA responsibilities, with information regarding                     According to Binney, Roark was a strong proponent of the                     program and worked hard to ensure that it was funded. However, according to Binney and several other NSA employees who were interviewed during this investigation, Roark did not have an accurate understanding of                     and believed it was

20. Binney explained to the FBI that after 9/11, the NSA decided to scale back the                     program. By his own admission, Binney was extremely upset about this decision. Moreover, at or about the same time, Binney learned that the TSP was being implemented. Significantly, Binney admitted that he was never "read in" to the TSP program · that is, he was never authorized to receive information concerning the

[1] Binney has been interviewed by the FBI on three occasions during this investigation: October 19, 2006, March 21, 2007, and June 28, 2007. The statements attributed to Binney in this affidavit were made during one or more of those interviews.

program. He also has admitted, however, that he learned of its existence, its covername (which remains unpublished today) and its basic outlines, from an NSA contractor who was not authorized to provide Binney this classified information.

21. Binney advised the FBI that because he was upset at NSA's decision to scale back                    in favor of the        he went to Roark, his contact on the HPSCI. According to Binney, in late 2001, while Roark was still with the HPSCI, Binney met her at her home in Hyattsville, Maryland, and told her what he knew about the TSP. According to NSA officials, Roark also had not been read in to the TSP (indeed, she has never been read in). Nevertheless, Binney informed the FBI that he and Roark then discussed various actions they could take to bring their concerns about the TSP to the attention of people within and outside the United States Government.

22. According to Binney, one step that he and Roark took was to disclose the existence of the TSP to Dale Griffiths, another NSA contractor who, according to NSA officials, was not read in to the TSP. According to Binney, Griffiths was a friend of the daughter of a U.S. Supreme Court Justice, and Binney and Roark hoped that Griffiths could facilitate a meeting with the Justice through the daughter. Binney told the FBI that this effort failed. Binney further stated that at or about the same time, Roark told him that she had called the presiding judge of the Foreign Intelligence Surveillance Court (FISC), Judge Colleen Kollar-Kotelly, to arrange a meeting; however, after an exchange of telephone calls with a court secretary, Roark was told to convey any concerns she had to the DOJ.

23. According to Binney, in late 2001 or early 2002, Roark arranged for him and Wiebe to brief a member of the HPSCI about the TSP. According to NSA officials, that

11

member was not read in to the TSP. Roark also told Binney that she went to the Chairman of the HPSCI, who was read in to the TSP, to discuss the TSP. According to the Chairman, who has been interviewed during the investigation, he told Roark to speak with General Michael Hayden, then the Director of the NSA, regarding her concerns. According to Binney, Roark told him that she spoke with General Hayden regarding her concerns about the TSP, as well as her belief that                    was a superior program. Roark subsequently told Binney that as far as she was aware, no action was taken by the NSA after her discussion with General Hayden.

## 2. Binney, Roark, Loomis And Wiebe Disclose Classified NSA Information Without Authorization

24. During his interview(s) with the FBI, Binney stated that in 2002, after he had left the NSA, he, Roark, Loomis and Wiebe created a thirteen-page summary of the          technology on his home computer. The idea to create the document originated with Roark, who wrote the first draft.    Binney, Wiebe, and Loomis subsequently wrote technical parts of the summary which the four subjects then e-mailed back and forth to one another from their home computers.    The subjects wrote the document as part of their effort to market innovative information technology solutions to potential customers, including government agencies, in connection with their Fledeling contracting business.

25. According to Binney, when the final document was completed in May 2002, Binney and Loomis, who are not NSA classification authorities, and were not even NSA employees at the time, conducted their own "classification review" and decided that the document was unclassified. Notably, Binney stated that no effort was made by Roark, Binney, Loomis, or Wiebe to submit the              summary for classification

12

review by appropriate authorities at the NSA.  Binney told the FBI that they based their

classification decision on the fact that there was "far worse" on the internet as other

contractor firms were far more open with their information than was the

memorandum and, if it was acceptable for other firms to be open about their classified or

sensitive information, it was acceptable for them.

      26.   In connection with this and other investigations in which I have

participated, I have learned that individuals who hold security clearances typically sign

agreements that they will safeguard classified information, report violations of security

rules, and not disseminate classified information to uncleared persons.  This matter is no

exception.  On November 22, 2002, Binney signed a security agreement with the NSA

governing his obligations regarding "protected information," which is defined in the

agreement as "information obtained as a result of my relationship with NSA which is

classified or in the process of a classification determination."  Wiebe signed the same

agreement on October 24, 2002, and Loomis signed it on November 21, 2002.  The

security agreement, a copy of which has been obtained in connection with the

investigation, states, in pertinent part:

> I understand that all Protected Information to which I may
> obtain access hereafter, is and will remain the property of the
> United States Government unless and until otherwise
> determined by an appropriate official or final ruling of a court
> of law.... I agree not to discuss matters pertaining to
> Protected Information except when necessary for the proper
> performance of my duties and only with persons who are
> currently authorized to receive such information and have a
> need-to-know...I understand the burden is upon me to
> determine whether information or materials within my control
> are considered by the NSA to be protected information, and
> whether the person(s) to whom disclosure is to be made is/are
> authorized to receive it.

In the agreement, Binney, Wiebe and Loomis also acknowledged that the unauthorized disclosure of "protected information" may constitute a violation of one or more of the following statutes – Sections 793, 794, 798, or 952 of Title 18, United States Code, and sections 421 through 426 and 783(b) of Title 50, United States Code.

27. The security agreement also contained a provision regarding the return of "protected information," underscoring its contraband nature if it is maintained in an uncleared space such as a person's home:

> I do not now, nor will I ever, possess any right, interest, title, or claim whatsoever to such information. I agree that upon demand by an authorized representative of the NSA or upon the conclusion of my authorized access to Protected Information, I shall return all material concerning such Protected Information in my possession, or for which I am responsible because of such access. I understand that failure to return such items may be a violation of Section 793 of Title 18, United States Code, and may constitute a crime for which I may be prosecuted.

28. Although Roark did not sign a security agreement with the NSA, she had signed one with the Central Intelligence Agency, which was similar in substance to the NSA agreement, as recently as July 24, 2001. A copy of that signed agreement also has been obtained and reviewed in connection with this investigation. In addition to the foregoing, I know from interviews of numerous Congressional officials that Roark, as a HPSCI staff member, regularly received and conducted briefings about highly classified programs and regularly was advised of the requirements and limitations associated with access to classified information. Indeed, in connection with this and other "leak" investigations in which I have participated, numerous Congressional officials have been interviewed, including elected officials and staff members, and all have acknowledged a knowledge and understanding of their responsibilities and duties with regard to classified

14

information.   This includes an obligation not to disclose classified information to
unauthorized persons.  Roark's knowledge of these requirements is further evidenced by
the fact that about eight months after the TSP "leak," she submitted a proposed editorial
— CIA, which forwarded it to the
to the ~~NSA~~ for pre-publication review.  In the editorial, a copy of which has been
obtained and reviewed in connection with this investigation, Roark touted the advantages
of                         over the           According to NSA officials, Roark eventually was
notified that the article she had submitted was not approved for publication because it
contained classified information.

### 3.     The Unauthorized Disclosure Of Classified NSA Information To A member Of The Media

29.  Notwithstanding the foregoing, on          2006, an article was published in
              titled                                                                 by
              which championed                       over the

                                                                    During an
interview of a former high-ranking FBI official in connection with this investigation, that
official stated that before publication of the          2006 story,          contacted her
and asked for information about the          specifically identifying it by the initials of the
covername for          Although the          article itself did not contain classified
information, the questions          asked the FBI official and the information set forth below
strongly suggest that          source or sources for          story
related classified          information to

30.  In that regard, Binney explained to the FBI that shortly before publication of
the          2006 article, Roark called Binney from her home in Oregon and told him she
was talking to          and that          was working on an article about

15

According to Binney, Roark further explained that the article was going to highlight her assertion that        was cheaper than the     and had        that the     did not have -- issues that Roark previously had raised with HPSCI members and General Hayden. Roark also asked Binney if he would talk to       but he declined.

31. Binney has further advised the FBI that during the same conversation, Roark asked him if the      he had done on the      program occurred in and Binney confirmed that it had. Roark concluded the conversation by asking Binney to e-mail her the thirteen-page summary of      that she, Binney, Loomis and Wiebe had written in 2002 and which contained details about the architecture of

According to Binney, he still had the document on his computer and e-mailed it from Binney3@verizon.net, his personal email address on his home computer, to dr20781@aol.com, Roark's personal email address on her home computer, with a copy to Wiebe at jkwiebe@comcast.net, his personal email address on his home computer.

32. When asked about the      2006 article by the FBI, Binney admitted that his answer to Roark's question about      in     appeared in the article. Likewise, he admitted that the article's discussion of

     seems to be directly lifted from the thirteen-page summary he provided to Roark. I believe that this suggests, at a minimum, that Roark read portions of the summary to      Moreover, she may have provided the entire document by hand, fax or email. According to Binney, before he sent the

     summary to Roark, she asked if he and Loomis would review the document to confirm it was unclassified. Binney then confirmed that he and Loomis believed it was

16

unclassified. While this facially suggests that Roark was sensitive to classification issues, it is worth noting that she, Binney and Loomis were no longer employed by the federal government, were not classification authorities, were fully aware of the appropriate procedure for seeking classification determinations, and never sought review of the document by the NSA before transmitting it through unsecure channels and sharing it with an uncleared member of the media.

33.  During his June 28, 2007 FBI interview, less than thirty days ago, Binney was asked if he still had the e-mail he sent to Roark in May 2006. Binney claimed that he no longer had the e-mail due to a computer virus. According to Binney, in the summer or fall of 2006, Binney and Wiebe had to "wipe" Binney's personal computer because it was infected with a virus. It should be noted, however, that Binney was first interviewed by the FBI about                    related matters on October 19, 2006, at or around the time he wiped his computer. In spite of this fact, Binney admitted that as of June 28, 2007, he still had a copy of the thirteen-page                    summary on his computer, claiming he was able to "reconfigure" the document.

34.  During the June 28, 2007 interview, Binney also indicated that he was told by Roark that she was "called in" to see the FBI, and that Binney should be careful and see an attorney as his name was brought up during her FBI meeting. Binney originally said Roark e-mailed this information to him; however, when he was asked for the e-mail by the interviewing agent, Binney changed his story and said that Roark had visited him and sent him a letter with the information. When asked for the letter, Binney said that he threw it away.

C.    **NSA's Review Of The Thirteen-Page                    Summary**

17

35. On March 25, 2007, several days after his second FBI interview, Binney voluntarily e-mailed to the FBI the thirteen-page                  summary which he originally had helped create in 2002. On May 10, 2007, the FBI provided that document to the NSA and requested that it conduct a thorough classification review of the summary. On June 26, 2007, NSA officials advised the FBI that the summary is a classified document at the                  level. As described above, this document was created, edited and emailed by and between Binney, Roark, Loomis and Wiebe. Moreover, there is reason to believe that Roark may have transmitted it to                  at or about the time                  article was published. Thus, it appears that a                  document, classified drafts of the document, and/or classified information contained in or relating to the document,                  were and are located on the personal computers and in the residences of Binney, Roark, Loomis and Wiebe.

## IV.  PREMISES TO BE SEARCHED AND ITEMS TO BE SEIZED

36. The investigation has established that 7800 Elberta Drive, Severn, Maryland, is Binney's primary residence. The property is a two-story, single family home in a subdivision, and is further described in Attachment A. The property also contains a light colored storage shed, which is located in the backyard, to the west of the residence, near several large trees. A property ownership search conducted through a Lexis-Nexis, a public database, on July 9, 2007, indicates that "William E. Binney" is the owner and occupant of the residence. "Carole J. Binney" is also listed as an owner and occupant. Binney is married to Carole J. Binney. "Matthew C. Binney" and "David A. Binney" are also occupants. Both Matthew and David are sons of Binney. On June 27,

2007, FBI Special Agents visited the premises to be searched and observed a maroon Ford Crown Victoria parked at the above address. This vehicle is registered to William Binney.

37. Binney was interviewed at this location on June 28, 2007. During this interview, Binney went to a room on the second floor to print off e-mail addresses for Roark, Wiebe, and Loomis, from his home computer. During this same interview, Binney gave the interviewing agent a business card that showed he was a Partner in Entity Mapping, LLC, which listed a business address of 7800 Elberta Road, Severn, Maryland, his residence. Thus, it appears that Binney works from his home, and uses it as his office, Binney also maintains personal and business records in his home and, given his technical expertise, will most likely maintain documents and information in various electronic storage devices and media there.

38. The investigation has further established that 2000 N. Scenic View Drive, Stayton, Oregon, is Roark's primary residence. The property is a one-story, single family home, with a finished attic and basement, located in a cul-de-sac, and is further described in Attachment B. A property ownership search conducted through Lexis-Nexis, a public database, on July 16, 2007, indicates that "Diane S. Roark" is the sole owner and occupant of the residence. According to a county assessor's report, the property also contains a storage shed or "machine shed" of approximately 384 square feet in size.

39. The investigation has further established that 515 Overdale Road, Baltimore, Maryland, is Loomis' primary residence. The property is a two-story, single family home with a basement, and is further described in Attachment C. A property ownership search conducted through Lexis-Nexis, a public database, on July 9, 2007,

19

indicates that "Edward F. Loomis Jr." is the owner and occupant of the residence. "Kathlene D. Loomis" is also listed as an owner and occupant. Loomis is married to Kathlene D. Loomis.

40.    The investigation has further established that 1390 Alison Court, Westminster, Maryland, is Wiebe's primary residence. The property is a two-story, single family home, and is further described in Attachment D. A property ownership search conducted through Lexis-Nexis, a public database, on July 9, 2007, indicates that "John K. Wiebe" is the owner and occupant of the residence. "Cynthia L. Wiebe" is also listed as an owner and occupant. Wiebe is married to Cynthia L. Wiebe. "Kristen M. Wiebe" is also an occupant. Kristen is a daughter of Wiebe.

41.    As noted above, Binney, Roark, Loomis and Wiebe conduct business out of their respective homes. Given that fact, and based upon my experience, I believe there is probable cause to believe that those individuals currently maintain in the premises to be searched documents such as calendars, datebooks, day planners, rolodexes, address books, phone logs, phone number lists, message slips, and/or other lists reflecting business associates and other contacts, including their phone numbers, addresses, email addresses, and other identifying and contact information. In that regard, they would need to be able to access such contact/address information for "ready-reference," in order to be able to make and return phone calls or otherwise maintain contact with current or former business and professional contacts. Such records serve as an information source or basis for ongoing or future contacts.  In this particular case, for example, a rolodex, dayplanner, datebook, address book, and other similar types of documents referenced in Attachment E will be particularly probative because they may provide evidence of

20

contacts, communications, appointments, and/or meetings by and between the subjects, members of the media and others.

42.     Additionally, I believe there is probable cause to believe that the subjects would also maintain in the premises to be searched the modern-electronic day business tools which one uses to maintain contact with business associates and others and keep appointments: a personal computer, a laptop or notebook computer, facsimile machine, a personal digital assistant, an electronic organizer, an electronic calendar, or a similar device. Moreover, with respect to email accounts, Binney advised the FBI that he and the other subjects of this affidavit maintain personal computers and send and receive email. He specifically identified the following email addresses associated with and used by the individual noted after the address: binney3@verizon.net (Binney); dr20781@aol.com (Roark);     jkwiebe@comcast.net     (Wiebe);     eloomis@erols.com     (Loomis); bill@entitymapping.com     (Binney);     ed@entitymapping.com     (Loomis); kirk@entitymapping.com (Wiebe); and all@entitymapping.com (jointly used by Binney, Loomis and Wiebe).   Based on my experience, I believe there is probable cause to believe that email address books on the subjects' personal computers will likely contain email addresses and or other identifying information for the business associates and other contacts with whom they have maintained, or continue to maintain, email communication.  My experience with most email programs and email address books also suggests that in many instances, even if an individual writes to another individual on only one occasion, the email address listed in the "to" portion of the email message will be automatically registered into the sender's email address book.  Even if the sender never again sends a message to that individual, the sender's email address book will likely

continue to preserve the recipient's email address for a future occasion when the sender contemplates emailing a message to that address.

43.     Based on my experience, I also believe there is probable cause to believe that the subjects may currently possess other materials in the premises to be searched and on their personal computers, such as files, newspaper clippings, newspaper articles, books or other reading material, photographs, email messages, or other documents and material regarding                                     or related matters, as well as evidence of conversations, meetings, and/or other contact about these subjects.   Accordingly, I request authorization to seize and search all such computers and related devices, as described in Attachment E, in order to obtain information and evidence that is within the scope of the requested search.

44.     Based on my experience, I also know that individuals who use cellular telephones, cordless telephones, and hard line telephones often enter the other party's phone number into the memory or address book on their telephone, provided those telephones have a memory and/or phone book feature.   Moreover, depending on how recently a call was made or received, the telephone itself may contain a listing of calls made to and from that phone. Accordingly, in connection with the requested searches, I also seek permission to seize such telephones for further analysis, as these items, too, may yield evidence of telephone contact by and between the subjects and others connected to the events described in this affidavit.

45.     Additionally, as noted above, both Binney and Roark appear to have storage sheds located on their respective properties. Since both Binney and Roark appear to work from home, both Binney and Roark may retain files, documents, and other

22

personal and business records in their respective storage sheds. In my experience, individuals use garages, attics, and such storage sheds as annexes in which files, documents, and other records may be stored for reference. Accordingly, the storage sheds located on Binney's and Roark's respective properties are specified in Attachments A and B as part of the premises to be searched.

## V.      SEARCH PROCEDURES FOR SEARCH OF COMPUTER DATA

46.      Based upon my training, experience, and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including hard disk drives, floppy drives, compact disks, magnetic tapes, memory chips, and the like. I also know that searching computerized information for evidence or instrumentalities of a crime commonly requires agents to seize most or all of a computer system's input/output peripheral devices, related software documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true for the following reasons:

a.      Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched;

b.      Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if

23

certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted; and

          c        Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

47. In searching for data capable of being read, stored, or interpreted by a computer, law enforcement personnel executing this search warrant will employ some or all of the following procedures:

          a.        Law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will assist with the search of the computers

24

and other electronic media referenced herein to determine whether these items contain any evidence and instrumentalities of violations of federal law.  The computers and other electronic media referenced herein will be reviewed by appropriately trained personnel and the case investigators in order to extract and seize any relevant data; and

            **b.**      The analysis of electronically stored data may entail any or all of several different techniques.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

        48.     In searching the data, the computer personnel and case investigators may examine all of the data contained in the computers and other electronic media referenced herein to view their precise contents and determine whether the data is relevant to the investigation.  In addition, the computer personnel may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the data is relevant to the investigation.

        49.     Although the thirteen-page           summary initially was created by the subjects in 2002, the information set forth above establishes that Binney has retained it through at least March 2007, and emailed to Roark in May 2006.  Because the

document and related materials were created for a business purpose, and Binney, Loomis and Wiebe are still engaged in that business activity. I believe there is probable cause to believe that the documents have been retained by all of the subjects and will be found at the search locations, including on their respective computers. Even if the the electronic documents have been "deleted," however, it is my understanding that they can recovered through technologies available to those who conduct such searches.

50.     Based on my knowledge, training, and experience, including the experience of other agents with whom I have spoken, I am aware that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the

26

ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

## VI.   OTHER SPECIAL PROCEDURES FOR THE ROARK SEARCH

51.     Roark has retained counsel in this matter, and documents that may be seized from Roark's residence may reflect confidential, attorney-client privileged communications. Therefore, I am cognizant of the possible application of the attorney-client privilege to some of the documents.   Consequently, special procedures will be undertaken to ensure that no attorney-client privileged materials are provided to any member of the prosecution team, including FBI agents or DOJ prosecutors working on this investigation. The following procedures will be used:

a.      No agent connected with this investigation will actually conduct any part of the review of any documents during the search.  Agents participating in the search will be briefed so that they will recognize potentially privileged material.  During the search, all potentially privileged material will be marked and segregated from other documents;

.b.      Following the seizure of the materials, a complete inventory will be left on site and the documents seized will be available for review (subject to appropriate security clearances) for a one-week period prior to release to the prosecution team for any assertion of privilege; and

c.      A review attorney from DOJ not connected with the investigation will review all seized documents to determine whether a privilege attaches.   Items potentially subject to a claim of privilege will remain segregated.  Upon a determination

27

that an item is not privileged, that item will be returned to its place with other seized materials. A log will be maintained detailing the disposition of each document in question. Items which are found to be subject to a privilege will be returned to Roark. If items are found to be subject to privilege, but it is also found that an exception to the privilege applies, such as the crime-fraud exception, that item will be submitted to the court for a privilege determination. Finally, if there is any question as to whether a document is privileged, that document will be submitted to the court for a privilege determination.

## VII. CONCLUSION

52. Based upon the evidence set forth herein, which I believe to be truthful and reliable, as well as my investigative experience. I believe that probable cause exists to believe that William Binney, Diane Roark, Edward Loomis and John Wiebe have engaged in the unauthorized disclosure of classified documents or materials to one another and other persons not authorized to receive it, including at least one member of the media, in violation of Title 18, United States Code. Sections 793 (Unlawful Disclosure of Classified National Defense Information), 798 (Unlawful Disclosure of Classified Information), and 371 (Conspiracy To Commit An Offense Against The United States). I further submit that a search of the above-described premises and containers therein will result in the seizure of items listed in Attachment E that may constitute the evidence, instrumentalities, or fruits of these offenses.

Paul Michael Marie, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on this __25__ day of July, 2007

United States Magistrate Judge
District of Maryland

29

**Attachment A**

Property to be Searched

The residence of William Binney, located at 7800 Elberta Drive, Severn, Maryland, more particularly described as follows:

7800 Elberta Drive, Severn, Maryland, is a two-story single family residence in a residential neighborhood, located on the west side of Elberta Drive, just north of Elberta Court. Elberta Drive ends in a cul-de-sac, and the search location is on the cul-de-sac. The residence has white or cream vinyl siding. An attached two car garage is located on the left side of the residence. The street facing windows are all bracketed by blue window shutters, the roof is a light colored composite tile, and the front door is a dark color. The residence sits on property which is approximately 19,383 square feet in size. The property also contains a light colored storage shed, which is located in the backyard, to the west of the residence, near several large trees. The shed is light colored and appears to be prefabricated.

30

## Attachment B

### Property to be Searched

The residence of Diane Roark, located at 2000 N. Scenic View Drive, Stayton, Oregon, more particularly described as follows:

2000 N. Scenic View Drive, Stayton, Oregon is a one-story, single family home, with a finished attic and basement. The residence has a dark brown roof and the building is light brown or tan in color. The residence is located at the north end of a cul-de-sac. There is a red sign on the left side of the driveway with the address 2000 North Scenic View Drive on it. The residence has a circular driveway and an attached garage. The residence has a green front door with gold lamps on either side of the door. The front door faces to the south. The property also contains a dark brown wooden shed, which lies to the right side of driveway.

31

## Attachment C

### Property to be Searched

The residence of Edward Loomis, located at 515 Overdale Road, Baltimore, Maryland, more particularly described as follows:

515 Overdale Road, Baltimore, Maryland, is a two-story, single family home with a basement, located in a rural neighborhood. The residence is located on the east side of Overdale Road where it intersects with Woodside Road. The residence is a combination of red brick on the first two floors, and white vinyl siding covering the peak of the roof. A detached two car garage is located to the right of the residence. The garage is a combination of red brick on the corners and white vinyl siding covering the peak of the garage above the garage door. The garage door is white with four glass windows. The street facing windows are all bracketed by black window shutters, the roof is a gray colored shale tile, and the front door is a white color and set up four steps from the front walkway.

32

**Attachment D**

Property to be Searched

The residence of John Wiebe, located at 1390 Alison Court, Westminster, Maryland, more particularly described as follows:

1390 Alison Court, Westminster, Maryland, is a two-story, single family home in a rural neighborhood. The residence has light gray colored siding. An attached three car garage is located on the first floor of the residence. The garage has three separate garage doors. The house is located on the west side of Alison Court just south of Warehime Road. Alison Court ends in a cul-de-sac, but the residence is located at the end of a long private driveway before the cul-de-sac. The long private driveway twists to the right, past one home on the left, then one home on the right and terminates in the garage of the residence. The residence is obscured by large trees in front of the home.

33

## Attachment F

### Items to be Seized

Any items which constitute evidence, instrumentalities, or fruits of violation of Title 18, United States Code, Sections 371 (Conspiracy To Commit An Offense Against The United States), 793 (Unlawful Disclosure of Classified National Defense Information), and 798 (Unlawful Disclosure of Classified Information), including specifically:

1. U.S. government documents, classified documents (including classified documents missing headers and footers), national defense intelligence documents and papers, and other documents relating to the National Security Agency (NSA).

2. Papers or documents relating to the transmittal of U.S. government documents, national defense and classified intelligence to representatives of the news media, or individuals not authorized to receive the information;

3. Computer hardware, meaning any and all computer equipment, including any electronic devices that are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data. Included within the definition of computer hardware is any data processing hardware (such as central processing units and self-contained laptop or notebook computers); internal and peripheral storage devices (such as floppy disks, compact disks/CD-roms, hard disk drives, flash drives, tapes, or similar data storage devices/media); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections); and any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as "dongles," keycards, physical keys, and locks).

4. Computer software, meaning any and all information, instructions, programs, or program codes, stored in the form of electronic, magnetic, optical, or other media, which is capable of being interpreted by a computer or its related components. Computer software may also include data, data fragments, or control characters integral to the operation of computer software, such as operating systems software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended to be used to communicate with computer components.

5. Computer-related documentation, meaning, any written, recorded, printed, or electronically-stored material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items

6. Computer passwords and data security devices, meaning any devices, programs, or data — whether themselves in the nature of hardware or software — that can be used or are designed to be used to restrict access to, or to facilitate concealment of, any

34

computer hardware, computer software, computer-related documentation, or electronic data records. Such items include, but are not limited to, data security hardware (such as encryption devices, chips, and circuit boards); passwords; data security software or information (such as test keys and encryption codes); and similar information that is required to access computer programs or data or to otherwise render programs or data into usable forms.

7. Any computer or electronic records, documents, and materials, including those used to facilitate interstate communications, in whatever form and by whatever means such records, documents, or materials, their drafts or their modifications, may have been created or stored, including, but not limited to, any hand-made form (such as writing or marking with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures or photocopies); any mechanical form (such as photographic records, printing, or typing); and electrical, electronic, optical, or magnetic form (such as data storage devices, tape recordings, cassettes, compact disks/CD-roms, optical disks, or the like), as well as printouts and readouts from any such storage devices

8. Any electronic information or data, stored in any form, which has been used or prepared for use either for periodic or random backup (whether deliberate, inadvertent, or automatically or manually initiated), of any computer or computer system. The form such information might take includes, but is not limited to, floppy disks fixed, hard disks, removable hard disk cartridges, tapes, laser disks, compact disks/CD-roms, video cassettes, and other media capable of data storage.

9. Any electronic storage device capable of collecting, storing, maintaining, retrieving, concealing, transmitting, and using electronic data, in the form of electronic records, documentation, and materials, including those used to facilitate interstate communications. Included within this paragraph is any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer-related equipment, such as floppy disk drives and disks, fixed hard disks, removable hard disk cartridges, tape drives and tapes, optical storage devices, laser disks, or other data storage devices.

10. Any personal digital assistants or electronic organizers, electronic calendars, or similar devices.

11. Any facsimile machines.

12. Any mobile/cellular telephone, cordless telephone, and land-line telephone with a memory and/or phone book feature.

13. Any and all phone records, to include, but not limited to, land-line phone records and cellular phone records.

14. Any and all notebooks, sheets of papers, or writing pads, including, but not limited to, those with typed or handwritten notes which relate to the                    program, the Terrorist Surveillance Program or other classified U.S. Government programs.

15. Any and all calendars, datebooks, day planners, rolodexes, address books, notes, journals, phone logs, phone number lists, message slips, other lists, electronic or otherwise, reflecting business associates and other contacts of personal associates, including their phone numbers, addresses, email addresses, dates of meetings or appointments, and other identifying and contact information; and/or other written correspondence that constitutes a record of telephonic contact, meetings, or appointments.

16. Any files, newspaper clippings, newspaper articles, books or other reading material, photographs, correspondence, email messages, or other documents and material, whether in hardcopy or electronic format, which concern the            program or the Terrorist Surveillance Program, including, but not limited to, documents or records describing, commenting, highlighting or annotating *New York Times* articles about the Terrorist Surveillance Program, the book State of War: The Secret History of the CIA and the Bush Administration, or                    articles.

17. Any correspondence, emails, documents, calendar or diary entries, electronic files, contact information, or data of any kind which reflect or relate to any communications or contacts of any kind with                    or any other reporter, journalist, employee or representative of

36